UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DANIELLE SMITH,

     Plaintiff,

v.                               CASE NO. 8:21-cv-1291-SDM-AEP

UNITED STATES DEPARTMENT
OF JUSTICE,

     Defendant.

_____/

## ORDER

     In this action under the Freedom of Information Act (FOIA), Danielle Smith sues (Doc. 1) for an order compelling disclosure of non-exempt documents responsive to three requests to the FBI.  Claiming that the disclosure of any withheld document would threaten a "pending law enforcement proceeding" and asserting that several other FOIA exemptions preclude disclosure, the DOJ moves (Doc. 22) for summary judgment.  Smith responds (Doc. 25) and principally argues that the "boilerplate" affidavit (Doc. 22-1) attached to the motion fails to establish that the FBI reasonably searched for responsive documents or that a FOIA exemption protects each withheld document from disclosure.

## BACKGROUND

     On April 13, 2021, Smith requested from the FBI "[fourteen] specific items related to Zackary Ellis Sanders."  (Doc. 22-1 at 3)  In March 2020, the United States

charged Sanders with production and possession of child pornography.  *United States*

*v. Zackary Ellis Sanders*, No. 1:20-cr-143-TSE (E.D. Va. 2020) (Doc. 1).  The arrest

and prosecution resulted after an undisclosed foreign law enforcement agency re-

ported to the FBI that the IP address registered to Sanders's residence had reached

on the "dark web" a website offering a particularly heinous form of child pornogra-

phy known as "hurtcore."[1]  In October 2021 after a trial and substantial litigation fo-

cused primarily on the international investigation that resulted in the report to the

FBI, Sanders was convicted of possessing and manufacturing child pornography.  In

April 2022, Sanders was sentenced to two-hundred sixteen months of imprisonment.

Sanders appealed (*Sanders*, Doc. 636) the conviction.  The appeal pends before the

Fourth Circuit.  *United States v. Sanders*, No. 22-4242.

      In her FOIA letter to the FBI, Smith requested:

> 11. All records relating in any way to Zackary Ellis Sanders
> from May 22, 2019, to February 10, 2020. This includes all seri-
> als for the HQ casefile and all subfiles, and all serials for Mr.
> Sanders's specific case file and subfiles[;]
>
> 12. All records pertaining to IP address 98.169.118.39 [Sand-
> ers's IP address] from May 22, 2019, to February 10, 2020[;
> and]
>
> 14. Any records referencing 'Hurtcore' but which also contain
> the term 'FLA' or the actual identified foreign country.

(Doc. 22-1 at 4)  After a search, the FBI located documents responsive to each of the

three requests.  The FBI released forty-three pages of "public source material" but

---

[1] A pending protective order (*Sanders*, Doc. 28) prohibits Sanders from disclosing the identity
of the foreign law enforcement agency that supplied the report or from disclosing any discovery that
might reveal the identity of the foreign law enforcement agency.

withheld every other responsive document under several exemptions to FOIA's general disclosure obligation. In response, Smith sues (Doc. 1) the Department of Justice for an order compelling the disclosure of any non-exempt document responsive to "categories #11, #12, and #14 in her [FOIA] request."

Arguing that an exemption protects each withheld document from disclosure, the DOJ moves (Doc. 22) for summary judgment. In response (Doc. 25), Smith challenges the FBI's search for responsive documents and the justification for withholding several documents.

## DISCUSSION

To support summary judgment in a FOIA action, the DOJ must demonstrate (1) "that the search for responsive documents was adequate," (2) that each claimed exemption "actually appl[ies]" to a withheld document, and (3) "that any reasonably segregable non[-]exempt information has been disclosed after deletion of exempt information." *Sanders v. Obama*, 729 F. Supp. 2d 148, 154 (D.D.C. 2010); *see* 5 U.S.C. § 552(a)(3); 5 U.S.C. § 552(b). In an affidavit appended (Doc. 22-1) to the DOJ's motion, Michael J. Seidel, Section Chief of the FBI's Record and Information Dissemination Section, explains the FBI's search for documents responsive to Smith's requests and the FBI's decision to withhold responsive documents. This declaration, the DOJ argues (Doc. 22 at 6, 14–15), satisfies the DOJ's burden and thus entitles the DOJ to summary judgment.

In response (Doc. 25) Smith argues principally that the Seidel declaration fails to demonstrate an adequate search for responsive documents and fails to

demonstrate that a claimed exemption "actually applies" to each withheld document. Smith concludes (Doc. 25 at 18) that summary judgment remains inappropriate "until the FBI corrects the deficiencies in its affidavits."

1.  The adequacy of the FBI's search

First, Smith argues that the FBI's motion for summary judgment fails to establish a reasonable search for documents responsive to Smith's requests. (Doc. 25 at 12) In assessing whether an agency conducted a reasonable search, the inquiry "is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Weisberg v. Dep't of Just.* (*Weisberg II*), 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis in original). To demonstrate an adequate search, the FBI must establish that the agency conducted the response to Smith's requests "in good faith using methods that are likely to produce the information requested." *Campbell v. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998). That is, "the agency must demonstrate that it has conducted a 'search reasonably calculated to uncover all relevant documents.'" *Weisberg II*, 745 F.2d at 1485 (quoting *Weisberg v. Dep't of Just.* (*Weisberg I*), 705 F.2d 1344, 1350–51 (D.C. Cir. 1983)). Although the agency need not "search every record system," the agency must respond to "the four corners of the request" and must search a system that the request suggests will contain responsive documents. *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996).

After interpreting Smith's request number eleven, twelve, and fourteen "to seek records on which Sanders'[s] name appears," the FBI searched for responsive

- 4 -

documents by querying the general indices to the FBI's central record system (CRS). (Doc. 22-1 at 11–12)  The CRS "is an extensive system of records" that "spans the entire FBI organization."  (Doc. 22-1 at 6)  At the start of each new investigation, the FBI creates in the CRS a case file, to which the FBI adds any record created or collected during the investigation.  (Doc. 22-1 at 6–7)  To manage "the enormous amount of information contained in the CRS" and to collect information about a subject that might exist in several case files, the FBI maintains several "general indices" to the CRS.  (Doc. 22-1 at 7)  The FBI might create an index about an individual, about an organization (which the FBI defines to include "places and things"), or about an event.  The FBI creates a new index "at the discretion of FBI investigators when information is deemed of sufficient significance to warrant indexing for future retrieval."  (Doc. 22-1 at 8)

The FBI normally responds to a FOIA request by querying these general indices.  "Index searches are the means by which potentially responsive records are located" and "in most cases represent the most reasonable means for the FBI to locate records potentially responsive to [a FOIA request]."  (Doc. 22-1 at 10)  After the FBI identifies an index with possibly responsive case files, an analyst reviews the documents in each file to identify any document that responds to "the specific parameters of [the] individual request[]."

In response to the three challenged requests, the FBI twice queried the general indices.  First, the FBI searched the indices "using the search term 'Zackary Sanders.'"  (Doc. 22-1 at 11–12)  The search returned an index on Sanders, which

- 5 -

contained one entry — the case file for the investigation that resulted in Sanders's criminal conviction.  This case file contained documents responsive to each request.  Second, the FBI searched the general indices "using the search [] term 'Hurtcore.'" (Doc. 22-1 at 12)  The FBI reviewed the results of the second search and concluded that no retrieved document responded to request number fourteen.  Because the Sanders case file "did not point to any additional locations" that might contain a document about the IP address in request twelve, the FBI declined to search the general indices for the IP address.  (Doc. 22-1 at 13)

The FBI argues that the two index searches, as well as the declination to search for an index on the IP address, constitute a "search reasonably calculated to locate records responsive to [Smith's] request[s]."  (Doc. 22 at 9)  In response, Smith argues that the FBI failed to adequately search for documents responsive to each request.[2]  Although Smith challenges some reasonable conduct, such as the decision to search for only one iteration of Sanders's name, Smith correctly argues that the FBI fails to demonstrate an adequate search for documents responsive to Smith's twelfth request.

As Smith correctly notes (Doc. 25 at 2, 9), the FBI admittedly "declined to use the listed IP address to search for records responsive to" request twelve.  As the sole

---

[2] Also, Smith argues that the FBI unreasonably failed to review a "separate 'HQ file'" and unreasonably excluded from the search "the FBI's Resident Agency office in Northern Virginia," despite evidence on the face of the request that responsive documents might exist in both. (Doc. 25 at 10 & n.5) Although the FBI fails to affirmatively demonstrate a search of the HQ file and of documents at the northern Virginia office, the Seidel declaration reasonably suggests that the FBI's index searches encompassed the entire universe of possible casefiles and offices available in the CRS.

justification for this declination, the FBI argues that "the IP address was referenced in the file indexed under Sanders'[s] name" and that Sanders's casefile "did not point to any additional locations where responsive records may reasonably be located." (Doc. 22-1 at 13)  Thus, the DOJ argues, the FBI reasonably declined to search for the IP address because "there was no evidence that [] any other locations or databases [] would contain any additional documents."  (Doc. 22 at 9)

But, as Smith notes (Doc. 25 at 10), the FBI fails to explain the seemingly "nonsensical" presumption that Sanders's casefile would "point to" a different location containing a document responsive to request twelve.  As the FBI readily admits, an index search constitutes "the most reasonable means . . . to locate records" because the CRS indices "are the . . . 'key' to locating records within the enormous amount of information contained in the CRS."  (Doc. 22-1 at 7, 10)  Accordingly, an index — not a casefile — would direct the FBI to another casefile containing responsive documents.  Thus, the claim that Sander's case file offered no direction to another responsive file is insufficient to justify the failure to search for the IP address.

Also, the FBI's index search for "hurtcore" undermines the justification for declining to search for the IP address.  If the Sanders casefile renders unnecessary an index search for the IP address, the file would render unnecessary a search for documents containing the term "hurtcore."  Because the FBI fails to explain why requests eleven and fourteen, but not request twelve, warranted an index search, the FBI fails to justify the refusal to implement "the most reasonable means . . . to locate records"

responsive to request twelve.  Accordingly, the DOJ fails to demonstrate a "reasonable search" in response to request twelve.

### 2.   The FBI's justifications for withholding documents

Second, Smith challenges whether an asserted exemption "actually applies" to each responsive document that the FBI withholds.  An agency responding to a FOIA request must disclose each responsive document unless a document "'may be withheld pursuant to one of the nine enumerated exemptions listed under [5 U.S.C.] § 552(b).'"  *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quoting *Dep't of Just. v. Julian*, 468 U.S. 1, 8 (1988)).  If an agency withholds a document under a FOIA exemption, the agency bears the burden of demonstrating that the asserted exemption protects the withheld document.  That is, the agency must establish an "adequate factual basis" from which to conclude that the asserted exemption protects the withheld document from disclosure.  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1258 (11th Cir. 2008).

Under *Miccosukee Tribe*, 516 F.3d at 1258, an agency may demonstrate an exemption's application "through affidavits, a *Vaughn* index, *in camera* review, or through a combination of these methods."  If an agency relies solely on an affidavit, however, the affidavit must "'provide specific information sufficient to place the documents within the exemption category.'"  *Fla. Immigrant Advoc. Ctr. v. Nat'l Sec. Agency*, 380 F. Supp. 2d 1332, 1338 (S.D. Fla. 2005) (quoting *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1384 (D.C. Cir. 1979)).

- 8 -

Except for forty-three pages of public material, the FBI withheld every document responsive to Smith's request eleven, twelve, and thirteen.  As "justification for [this] non-disclosure," the Seidel declaration (Doc. 22-1 at 13–29) first asserts that each document warrants withholding under 5 U.S.C. § 552(b)(7)(A), otherwise known as "exemption 7(A)."  Alternatively, Seidel asserts several "underlying exemptions" that protect from disclosure "exempt portions of [] responsive documents."

A.  Exemption 7(A)

In 5 U.S.C. § 552 (b)(7), FOIA exempts from disclosure "records compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records . . . (A) could reasonably be expected to interfere with enforcement proceedings."  To enjoy exemption 7(A)'s protection, the agency must "demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'"  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d at 1082, 1096 (D.C. Cir. 2014).  No party disputes that Sanders's pending appeal, as well as the reasonably anticipated prosecution of other persons who visited the "hurtcore" website, constitutes a protected law enforcement proceeding.  Rather, the parties dispute whether the DOJ sufficiently explains how the disclosure of each category of withheld documents would reasonably interfere with those proceedings.

Unlike other FOIA exemptions, which require an agency to justify each document's withholding or redaction, exemption 7(A) permits an agency to "group[]

- 9 -

documents in categories and offer[] generic reasons for withholding the documents in each category." *Citizens for Resp. & Ethics in Wash.*, 746 F.3d at 1098.  To enjoy this categorical protection, however, the agency must (1) "define its categories functionally," (2) "conduct a document-by-document review [to] assign documents to the proper category," and (3) "explain to the court how the release of each category would interfere" with an enforcement proceeding.

Exemption 7(A) confers on an agency no *carte blanche* authority to withhold a record "'merely because the record has found its way into an investigative file.'" *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986) (quoting *Campbell v. Dep't of Health & Human Servs.*, 682 F.2d 256, 265 (D.C. Cir. 1982)).  Instead, the agency must for each category of withheld documents proffer a "functional definition" of the category that "allows the court to trace a rational link between the nature of the document [in the category] and the alleged likely interference." *Crooker*, 789 F.2d at 67.  Each functional definition "must be sufficiently distinct to allow a court to grasp 'how each . . . category of documents, if disclosed, would interfere with the investigation.'" *Crooker*, 789 F.2d at 67.  In other words, to withhold a category of documents under exemption 7(A), an agency (1) must categorize the withheld documents based on a common characteristic that threatens a law enforcement proceeding, (2) must define each category to permit a reviewing court to understand the common characteristic joining each document in the category, and (3) must craft "sufficiently distinct" categories to permit a reviewing court to understand the documents in each category.

- 10 -

In this action, the FBI withholds under exemption 7(A) documents in two broad categories, each of which category the FBI further divides into several "functional categories." First, the FBI identifies "administrative materials," including "case captions, serial numbers, identities of FBI field offices[,] [and] detail[ed] instructions designed to ensure that investigative procedures are conducted within the appropriate FBI and DOJ guidelines." (Doc. 22-1 at 24–25) The FBI divides "administrative materials" into two functional categories: "reporting communications," which "permit the FBI [and] other agencies to monitor the process of the investigation and to facilitate [the investigation's conduct]," and "administrative instructions," which "set[] out . . . investigative guidelines" and "request[] . . . specific investigative inquiries at various FBI field offices or other government agencies."

The FBI reports that the disclosure of administrative material might "enable suspects to discern a 'road map' of the investigation" and thus subvert or avoid a criminal prosecution. Specifically, the FBI states that reporting communications "are replete with detailed information about investigative activities as well as detailed information about potential victims" and "contain background information about third-party individuals," including an individual's "relationship with a pending investigation." Also, the FBI reports that the disclosure of the administrative instructions might "permit the subjects of these investigations to anticipate [the investigation] and possibly alter or negate incriminating evidence." Thus, the FBI concludes, disclosure of administrative documents might allow a suspect to learn (1) the existence of an

- 11 -

investigation, (2) "the nature and scope" of the investigation, and (3) "the perceived weaknesses in the investigation."

Second, the FBI withholds "evidentiary and investigative materials," including "copies of records or evidence[] and derivative communications discussing or incorporating evidence." (Doc. 22-1 at 26–28) The FBI divides "evidentiary and investigate materials" into two functional categories: "information concerning physical and documentary evidence" (descriptions of evidence), which "may include . . . records obtained through or summarizing information gathered through searches, seizures, [interviews], and any other law enforcement [or] intelligence gathering activities,"[3] and "exchange of information between various law enforcement agencies," (information exchange) which includes "records documenting and detailing the exchange of information among other law enforcement partners."

The FBI reports that disclosing a description of evidence would allow a suspect (1) "to estimate the scope of the FBI's investigation," (2) "to discern the FBI's investigative strategies and employ countermeasures," and (3) "to formulate strategies to contradict evidence to be presented in [c]ourt." (Doc. 22-1 at 28) The FBI reports that disclosing an information exchange would "disclose investigative information developed by various agencies" to help identify suspects or witnesses and exchanged under "the mutual understanding that information provided to the FBI by

_____

[3] The FBI reports that even "more fully describ[ing] these records could reasonably lead to disclosure of the nature of the pending investigative efforts" and thus declines to further describe the category or to delimit the documents that actually compose, rather than "might" compose, the category.

those agencies will not be prematurely released." (Doc. 22-1 at 28)  Further, the FBI claims that disclosure of the information exchanges "would identify the investigative interest in particular individuals and subject witnesses [or] victims to potential harassment."

Although supporting the categorical withholding of (1) reporting communications, (2) administrative instructions, and (3) descriptions of evidence, the Seidel declaration fails to demonstrate how the information-exchange category warrants withholding under exemption 7(A).  The declaration claims that the release of any document in this category "will disclose investigative information" and might subject a witness or victim to "harassment [or] intimidation."  But this justification appears overbroad because, unlike the other categories, the FBI fails to define the information-exchange category "functionally."  Unlike the other categories, which the FBI defines to include documents the disclosure of which pose a specific harm to an investigation,[4] the FBI defines the information-exchange category to encompass any exchange of any information between the FBI and another law enforcement agency. In other words, the FBI fails to connect the asserted harm — disclosure of information about "subjects, suspects, or other individuals of potentially investigative interest" — to the definition of the information-exchange category — any communication from, to, or between and FBI agent and an agent of another law enforcement

---

[4] For example, because the DOJ defines "administrative instructions" to encompass guidelines for the investigation and specific requests for investigative inquiries, the asserted harm attending disclosure of this category—a suspect's ability to discern a "roadmap" of the investigation—flows immediately and authoritatively from the functional definition.

agency.  Of course, most of these communications likely discuss information that, if disclosed, would harm an investigation.  But the FBI fails to demonstrate that every communication discusses protected information, and the FBI otherwise fails to limit the category to encompass only documents exchanging this protected information.

Further, by claiming that information-exchange documents discuss suspects, witnesses, or evidence, the Seidel declaration suggests that some (or all) of the documents in this category warrant exemption as a reporting communication or as a description of evidence.  If each information-exchange document warrants withholding under another category, the information-exchange category appears superfluous.

Finally, as Smith notes in response (Doc. 25 at 16), "the mutual understanding" between the FBI and other law enforcement agencies "that the information . . . will not be prematurely released" fails to justify a categorical withholding under exemption 7(A).  Although this understanding might support another FOIA exemption, the Seidel declaration fails to explain how a disclosure inconsistent with this "understanding" would impair a pending — rather than prospective or potential — law enforcement proceeding.

The FBI attempts to categorically withhold any document in which an FBI agent communicated with an agent from another law enforcement agency.  The FBI predicates this categorical withholding on the fact that the FBI communicated with another agency.  No record material explains why the disclosure of that fact — the FBI's communicating with another agency — would so threaten to impede a pending law enforcement proceeding as to justify the categorical protection of

- 14 -

exemption 7(A).  Because the Seidel declaration lacks the "specific information" necessary to "trace a rational link" from a shared characteristic of the documents in the information-exchange category to some likely interference with a pending law enforcement proceeding, the DOJ fails to justify the categorical withholding of the information-exchange documents and thus fails to demonstrate entitlement to summary judgment.

B.  The "underlying exemptions"

Finally, "[i]n light of" *Maydak v. U.S. Department of Justice*, 218 F.3d 760 (D.C. Cir. 2000), the DOJ asserts that several "underlying" exemptions protect from disclosure a document or a part of a document already withheld under exemption 7(A). (Doc. 22 at 15) (citing 5 U.S.C. § 552(b)(3), (b)(5), (b)(6), (b)(7)(c), (b)(7)(D), and (b)(7)(E)).  As the DOJ concedes (Doc. 22 at 15), however, "the discussions of the [underlying] exemptions are held at a general level" in the Seidel declaration.  As Smith notes in response (Doc. 25 at 18–25), if exemption 7(A) fails to protect a withheld document, the FBI's "general" discussion fails to support summary judgment based on an underlying exemption — none of which authorizes the categorical withholding of an entire document.  Although the Seidel justification supports the withholding of some information under each asserted exemption, the DOJ does not — and, without describing a single document, cannot — establish either that an underlying exemption protects from disclosure the entirety of an unstated number of responsive documents or that segregation and disclosure of the unprotected information in the unstated number of responsive documents is infeasible.  Under

- 15 -

*Maydak*, the DOJ preserves its right to later invoke each asserted underlying exemption, but no underlying exemption currently justifies summary judgment.

## CONCLUSION

For these reasons, the DOJ fails to establish a reasonable search in response to Smith's twelfth request and fails to show that the information-exchange documents warrant categorical withholding under exemption 7(A).  Accordingly, the motion (Doc. 22) for summary judgment is **DENIED WITHOUT PREJUDICE**.  Not later than **OCTOBER 23, 2022**, the DOJ may renew the motion.  To support a renewed motion, the DOJ may attach amended declarations, supplemental declarations, or a *Vaughn* index and may move for *in camera* review of the withheld documents.

ORDERED in Tampa, Florida, on September 8, 2022.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE